UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------
STEPHANIE HOLLOMAN,

                Plaintiff,                    **MEMORANDUM & ORDER**
                                                          17-CV-4386 (MKB)

                v.

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

       Plaintiff Stephanie Holloman, proceeding *pro se*, commenced the above-captioned action pursuant to 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for disability insurance benefits and supplemental security income benefits under the Social Security Act (the "SSA"). (Compl., Docket Entry No. 1.) The Commissioner moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, arguing that Administrative Law Judge Ifeoma Iwumandi (the "ALJ") correctly found that Plaintiff was not disabled. (Comm'r Mot. for J. on the Pleadings ("Comm'r Mot."), Docket Entry No. 17; Comm'r Mem. of Law in Supp. of Comm'r Mot. ("Comm'r Mem."), Docket Entry No. 18.) Plaintiff opposes the Commissioner's motion. (Pl. Letter in Opp. ("Pl. Opp'n"), Docket Entry No. 16.) For the reasons discussed below, the Court denies the Commissioner's motion for judgment on the pleadings and remands the case for further proceedings consistent with this Memorandum and Order.

**I. Background**

       Plaintiff was born in 1968. (Certified Admin. Record ("R.") 30, Docket Entry No. 8.) From 2002 through 2004, Plaintiff worked at BJ's Wholesale Club, Target, and Trader's Joes.

(R. 46–47.) Plaintiff subsequently worked as a security guard at Building Star and then as a custodian at Amityville Union Free School. (R. 47.)

In 2010, Plaintiff relocated to South Carolina after her father's death to help her mother. (R. 48.) While cleaning her mother's home, Plaintiff began having back pain and complained to her mother about the pain. (R. 48.) Plaintiff had difficulty moving. (R. 48.) Shortly thereafter, Plaintiff was unable to work because of her back pain. (R. 49.)

In 2014, Plaintiff's son passed away. (R. 49.) Plaintiff attended weekly therapy sessions to cope with her son's death. (R. 49.) She also took medication to help her cope with depression. (R. 49.) Her son's death was another reason Plaintiff was unable to work. (R. 49.)

On July 9, 2013, Plaintiff applied for disability insurance benefits and social security income, asserting that she had been disabled since June 1, 2011, due to back problems, asthma, hypertension, heart problems, and anxiety. (R. 385–97, 422, 426.) On October 2, 2013, Plaintiff's application was denied. (R. 222.) Upon reconsideration, Plaintiff's denial was upheld. (R. 227.) Plaintiff requested a hearing before an administrative law judge. (R. 231–33.) She appeared with counsel at the administrative hearing, which began on March 5, 2015, and continued on February 12, 2016 and August 18, 2016. (R. 40–156.) After the hearing, the ALJ found that Plaintiff was not disabled. (R. 10–39.) On July 15, 2017, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the Commissioner's final decision. (R. 1–6.) Plaintiff filed a timely appeal with the Court.

    a.    **Hearing before the ALJ**

        i.    **Plaintiff's testimony**

Plaintiff testified that she cannot walk more than one and a half blocks in distance or more than a half hour at a time because of her back pain. (R. 53.) She is limited to standing and

sitting for about half an hour each. (R. 53, 88, 90–91.) Plaintiff can lift a purse, but not a gallon of water or a bag of potatoes. (R. 54, 91.) She cannot reach overhead, but can reach in other directions, and she does not have difficulty grasping objects. (R. 54–55.) Plaintiff can drive, but only drives to her medical appointments. (R. 58.)

Plaintiff testified that she feels back pain "all the time." (R. 50–51.) She receives physical therapy, but it does not help. (R. 51.) Plaintiff was receiving injections to relieve the pain, but stopped receiving them because she is asthmatic. (R. 51.)

### ii. Medical expert's testimony

On February 12, 2016, Dr. John Schosheim, a psychiatrist, testified as a medical expert at Plaintiff's hearing. (R. 144–47, 987.) Dr. Schosheim reviewed the record and opined that Plaintiff has no impairments in performing activities of daily living or in social functioning, and only a mild to moderate impairment in maintaining concentration, persistence, and pace. (R. 145.)

### iii. Vocational expert's testimony

On August 18, 2016, Dale Pasculli, a certified rehabilitation counselor, testified as a vocational expert ("VE"). (R. 64–67, 539–40.) The ALJ asked the VE the following question:

> [A]assume a hypothetical individual with the [Plaintiff's] age and education, and with the past jobs [of security guard, custodian, janitor, and stock clerk]. Further assume this individual is limited to sedentary work with occasional right overhead reach, occasionally climb ramps and stairs, occasionally stoop, kneel, crouch, and crawl, and on concentrated exposure to dust, odors, fumes, and pulmonary irritants.

(R. 65–66.) The VE identified two jobs that this hypothetical individual could perform, each existing in significant numbers in the national economy: (1) "addresser" and (2) "polisher, eye glass frames." (R. 66–67.)

3

### b. Relevant medical evidence

The Court has reviewed the non-medical and medical evidence contained in the record, and provides a brief summary of the medical evidence relevant to this Memorandum and Order.

#### i. Physical impairments

##### 1. Carolina Medical Center

On September 23, 2013, Plaintiff met with Dr. Sanjay Kumar, M.D., an internist at Carolina Medical Center, for a vocational rehabilitation examination. (R. 736–37.) Plaintiff complained of asthma, anxiety, hypertension, diabetes, and intermittent back pain. (R. 736–37.) Dr. Kumar assessed that Plaintiff could do basic work related activities with no limitations in sitting, standing, walking, lifting, carrying, or handling objects. (R. 737.)

##### 2. Dr. Jean Smolka

On January 9, 2014, Dr. Jean Smolka, M.D., a state agency medical consultant, reviewed Plaintiff's medical record and concluded that Plaintiff could occasionally lift and carry fifty pounds and frequently lift and carry twenty-five pounds. (R. 198.) Dr. Smolka further stated that Plaintiff could occasionally climb ladders, ropes, and scaffolds, kneel and craw, and could frequently climb ramps and stairs, stoop, and crouch. (R. 198–99.)

##### 3. St. John's Episcopal Hospital

On October 14, 2014, Plaintiff visited Saint John's Episcopal Hospital ("St. John's") outpatient clinic complaining of back pain. (R. 905.) Plaintiff had been experiencing an increase in back pain as she walked, and felt numbness and tingling when sitting for long periods of time. (R. 905.) An examination of Plaintiff's back revealed a decreased range of motion and pain on palpation. (R. 905.) X-rays of Plaintiff's lumbar and thoracic spine, taken the same day, were unremarkable. (R. 911–12.)

On November 11, 2014, Plaintiff again went to St. John's complaining of back pain. (R. 906–07.) Plaintiff reported that her back pain had gotten worse since her car accident in 1995. (R. 906.) On a scale of one to ten, Plaintiff rated her back pain level as fifteen. (R. 906.) The attending doctor ordered an MRI of Plaintiff's lumbar spine. (R. 906.)

A progress note dated December 2, 2014 states that the MRI indicated degenerative changes at L5-S1, with a post-annular tear, a disc bulge without mass effect on the existing nerve roots, and no significant stenosis. (R. 907.) The MRI also showed a disc bulge at L4-L5 touching the existing L4 nerve root, as well as facet arthropathy with mild narrowing of the canal. (R. 907.) On January 14, 2015, an electromyogram and nerve conduction (EMG/NCS) study revealed L3-L4, L4-L5, and S1 radiculopathy. (R. 800–03, 998–1000.)

On February 24, 2015, Plaintiff returned to St. John's Orthopedics Department to follow up on the results of her MRI and EMG/NCS. (R. 908–09.) An examination revealed that Plaintiff had lower back pain on palpation and with extension, flexion, and rotation. (R. 908.) The pain also radiated to Plaintiff's legs. (R. 908–09.) Plaintiff was instructed to continue physical therapy. (R. 909.) A diagnosis of fibromyalgia was ruled out. (R. 909.)

On March 6, 2015, Dr. Robert Limani noted that x-rays of Plaintiff's thoracic spine indicated multiple small disc bulges, but no evidence of significant spinal stenosis. (R. 901.)

On December 1, 2015, at a follow-up visit at St. John's, progress notes indicate lumbar tenderness and range of motion limited by pain. (R. 986.) The doctor assessed fibromyalgia and recommended Plaintiff for pain management. (R. 986.)

### 4. Addabbo Family Health Center

On February 3, 2016, Maria Rodriguez, M.D., an internist at the Addabbo Family Health Center, completed forms on behalf of Plaintiff for the New York City Human Resources

Administration and indicated that Plaintiff would be unable to work for at least twelve months. (R. 990–92.) Dr. Rodriguez diagnosed Plaintiff with thoraco-lumbar neuritis, hypertension, and asthma. (R. 991.) Dr. Rodriguez reviewed Plaintiff's MRI and found degeneration of L5-S1, with post-annular tear; disc bulge without mass effect on existing nerve root; no significant stenosis; and L4-L5 degenerative bulge with mild narrowing of canal. (R. 991.)

### 5. Dr. Chaim Shtock

On March 7, 2016, Dr. Chaim Shtock conducted a consultative neurological examination of Plaintiff. (R. 1010–21.) Plaintiff complained of lower back pain that radiated upward, with an episodic tingling sensation in her left leg. (R. 1010.) She needed no help changing for the examination or getting on and off the examining table, and, with some difficulty, was able to rise from a chair. (R. 1010.) Dr. Shtock also reviewed X-rays of Plaintiff's lumbar spine, taken March 9, 2016, and prior diagnostic studies, including Plaintiff's MRI and EMG/NCS reports. (R. 1013–15.) Dr. Shtock opined that Plaintiff had moderate limitations with heavy lifting, kneeling, crouching, and frequent bending. (R. 1013.) She had moderate-to-marked limitations for squatting, and mild-to-moderate limitations with frequent stair climbing, walking long distances, standing for long periods, and sitting for long periods. (R. 1013.) He also concluded that Plaintiff had mild limitations performing overhead activities and fine and gross manual activities (with both arms and hands). (R. 1013.)

Dr. Shtock completed a questionnaire in which he stated that Plaintiff could frequently lift and carry up to ten pounds. (R. 1016.) In an eight-hour workday, Plaintiff could sit for four hours, stand for two hours, and walk for two hours. (R. 1017.) Dr. Shtock also stated that Plaintiff could frequently use her arms and hands for reaching, handling, fingering, feeling, pushing, and pulling. (R. 1018.) Dr. Shtock noted that Plaintiff could occasionally climb ladders

6

and scaffolds, and could frequently climb stairs and ramps, balance, stoop, kneel, crouch, and crawl. (R. 1019.)

### 6. SUNY Downstate Medical Center

On March 15, 2016, Plaintiff met with Hiroyuki Yoshihara, M.D., at SUNY Downstate Medical Center, complaining of back pain. (R. 1031, 1033.) Plaintiff reported that injections and physical therapy did not help with her pain. (R. 1031.) Dr. Yoshihara observed mild tenderness to palpation of Plaintiff's lumbar spine and left sacroiliac joint. (R. 1031.) Dr. Yoshihara ordered an MRI of Plaintiff's lumbar spine. (R. 1033.)

On June 23, 2016, an MRI of Plaintiff's cervical spine revealed disc herniations at C3-C4 and C5-C6, deformation of the thecal sac, with C5-C6 abutment; disc bulges at C2-C3 and C6-C7; cervical spine straightening; and sinus mucosal thickening. (R. 1027–28.) A June 26, 2016 lumbar MRI revealed disc bulges at L4-L5 and L5-S1, and a disc herniation at T8-T9, possibly deforming the thecal sac and abutting the thoracic spinal cord. (R. 1025–26.)

On July 5, 2016, Plaintiff returned to Dr. Yoshihara and the doctor noted tenderness to palpation over the musculature throughout Plaintiff's spine. (R. 1032.) Dr. Yoshihara reviewed Plaintiff's MRI results and described them as showing mild degenerative disc disease. (R. 1032.) He advised Plaintiff to continue physical therapy and pain management, and to lose weight. (R. 1032.)

### ii. Mental impairments

### 1. Hope Clinic

On July 27, 2012, Plaintiff went to the Hope Clinic complaining of "anxiety type symptoms." (R. 609–10.) Plaintiff was prescribed Atarax (hydroxyzine). (R. 609–10.) On October 15, 2012, Temisa L. Etikenrentse, M.D., completed a questionnaire regarding Plaintiff's

7

mental condition. (R. 632.) According to the questionnaire, Plaintiff displayed a worried and anxious mood/affect. (R. 632.) Despite this, Plaintiff was fully oriented, her thought process was intact, and her thought content was appropriate. (R. 632.) Plaintiff's attention, concentration, and memory were also good. (R. 632.) Dr. Etikenrentse opined that Plaintiff exhibited slight work-related limitations and her anxiety could be exacerbated by a stressful work environment. (R. 632.) Dr. Etikenrentse did not recommend psychiatric treatment. (R. 632.)

### 2. Walterboro Adult & Pediatric Medicine

On August 29, 2012, Plaintiff visited Walterboro Adult & Pediatric Medicine ("Waterboro") and met with Dr. Stania DeJesus. (R. 625.) Dr. DeJesus prescribed Klonopin for Plaintiff's anxiety and determined that Plaintiff's hypertension had improved. (R. 625.) On September 3, 2013, Dr. DeJesus completed a questionnaire concerning Plaintiff's mental condition. (R. 729, 734.) Dr. DeJesus opined that Plaintiff did not exhibit any work-related functional limitations due to her mental condition. (R. 729.) Plaintiff appeared fully oriented with an intact thought process, appropriate thought content, normal mood and affect, and good attention, concentration, and memory. (R. 729.) Dr. DeJesus did not recommend psychiatric treatment. (R. 729.)

### 3. Catholic Charities

On October 22, 2014, Plaintiff visited Catholic Charities because of her depressed and angry mood following the death of her son one month earlier. (R. 846.) On October 31, 2014, Plaintiff attended a psychosocial intake assessment conducted by Angel Collazo, a social worker at Catholic Charities. (R. 816–27, 847, 995–96.) The social worker assessed Plaintiff's mood as euthymic or non-depressed. (R. 816.) Activities of daily living skills were intact, Plaintiff's

insight and judgment were good, and she denied any suicidal tendencies. (R. 816, 823, 995.) Plaintiff was scheduled for short-term treatment to help her grieving process. (R. 843–45.) Plaintiff attended these treatment sessions from November of 2014 through February of 2015. (R. 850–79.) During the sessions, Plaintiff's mood was generally stable; she discussed the death of her son, coping skills, and interaction with family. (R. 850–79.)

### c. The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the Social Security Administration under the authority of the SSA. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 1, 2011, the alleged onset date of her disability. (R. 15.) Second, the ALJ found that Plaintiff had the following severe impairments: obesity, asthma, hypertension, lumbar radiculopathy, and disorders of the thoracic and lumbar spine. (R. 16.) Third, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or was equal to the severity of one of the impairments listed in Appendix 1 of the Commissioner's Regulations. (R. 16.) The ALJ also found that Plaintiff's other impairments did not meet any of the Listing criteria in Appendix 1. (R. 16.) Next, the ALJ determined that Plaintiff had the residual functional capacity to perform sedentary work, except that Plaintiff "can occasionally reach overhead, climb ramps and stairs, stoop, kneel, crouch, and crawl. Additionally, [Plaintiff] cannot have concentrated exposure to dust, odors, fumes, and pulmonary irritants" and Plaintiff "can perform simple work related decisions." (R. 20.) In making this RFC finding, the ALJ stated that the RFC "is supported by the opinion of the Dr. John P Schosheim, the impartial medical expert, the opinions of the state agency consultative examiners and medical consultants, and the opinions of the [Plaintiff's] treating doctor, Dr. Stania DeJesus." (R. 29.) The ALJ assigned "little weight" to one of Plaintiff's treating doctor

Dr. Rodriguez. (R. 27.)

## II. Discussion

### a. Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same). Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted omitted). In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."). The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted). If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see also Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "In making such determinations, courts should be

10

mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'" *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

b.  **Availability of benefits**

Supplemental security income and disability insurance benefits are available to individuals who are "disabled" within the meaning of the SSA.[1] To be considered disabled under the SSA, a plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B). The Commissioner has promulgated a five-step analysis for evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When

---

[1] Supplemental security income is available to individuals who are either sixty-five years of age or older, blind or disabled and who meet certain income requirements. 42 U.S.C. §§ 1382(a), 1382c(a)(1)(A); 20 C.F.R. § 416.202. Disability insurance benefits are available to individuals who became disabled while meeting the insurance status requirements of the SSA. 42 U.S.C. §§ 423(a)(1)(A), 423(c). The only issue before the Court is whether Plaintiff is disabled.

> the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)); *see also Lesterhuis*, 805 F.3d at 86 n.2 (describing the "five-step sequential evaluation for adjudication of disability claims, set forth at 20 C.F.R. § 404.1520"); *McIntyre*, 758 F.3d at 150 (describing "the five-step, sequential evaluation process used to determine whether a claimant is disabled" (citing 20 C.F.R. § 416.920(a)(4)(i)–(v))).

c. **Analysis**

The Commissioner contends that substantial evidence supports (1) the ALJ's RFC finding that Plaintiff can perform sedentary work, (R. 25), and (2) the ALJ's finding that Plaintiff does not have a severe mental impairment, (R. 20). The Commissioner further argues that the ALJ therefore properly found that Plaintiff is not disabled. (R. 30.)

The Court has conducted a thorough review of the record and in accordance with general principals regarding *pro se* parties, construed Plaintiff's filings "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Based on this review, the Court concludes that the ALJ did not properly comply with the treating physician rule.

"[A] treating physician's statement that the claimant is disabled cannot itself be determinative." *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (same). But a treating physician's opinion as to the "nature and severity" of a plaintiff's

12

impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record."[2] 20 C.F.R. § 404.1527(c)(2); *see Lesterhuis*, 805 F.3d at 88 (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))).

If an ALJ declines to give a treating physician's opinion controlling weight, the ALJ must consider a number of factors to determine how much weight to assign to the treating physician's opinion, specifically: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)) (discussing the factors). The ALJ must set forth the reasons for the weight assigned to the treating physician's opinion. *Halloran*, 362 F.3d at 32. While the ALJ is not required to explicitly discuss the factors, it must be clear from the decision that the proper analysis was undertaken. *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we

---

[2] The regulations define "treating source" as the claimant's "own physician, psychologist, or other acceptable medical source who provides [a claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Brickhouse v. Astrue*, 331 F. App'x 875, 877 (2d Cir. 2009) (quoting 20 C.F.R. § 404.1502). A "nontreating source" is defined as a "physician, psychologist, or other acceptable medical source who has examined [the plaintiff] but does not have, or did not have, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 416.902.

13

do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)). Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see also Halloran*, 362 F.3d at 32–33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion . . . .").

In general, "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419. This is because "consultative exams are often brief, are generally performed without the benefit or review of [the] claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990); *see also Hernandez v. Astrue*, 814 F. Supp. 2d 168, 182–83 (E.D.N.Y. 2011) ("[T]he opinion of a consultative physician, 'who only examined a plaintiff once, should not be accorded the same weight as the opinion of [a] plaintiff's treating psychotherapist.'" (quoting *Cruz*, 912 F.2d at 13)).

The ALJ summarized Dr. Rodriguez's opinion as finding that Plaintiff "cannot climb, bend, or walk for any prolonged period, without experiencing severe back pain," has "limitations with traveling," and "is unable to work for at least twelve months." (R. 27.) The ALJ concluded that Dr. Rodriguez's opinion was only entitled to "little weight" because it (1) was inconsistent with other opinions in the record, and (2) "with . . . [Plaintiff's] activities of daily living including being able to shop, do boot camp, cook, clean, go out with friends, drive to North Carolina." (R. 27.) Neither of the ALJ's reasons are sufficient for disregarding the treating

14

physician rule and assigning little weight to Dr. Rodriguez's opinion.[3]

### i. Dr. Rodriguez's opinion is consistent with the record

The ALJ's first reason for discounting Dr. Rodriguez's medical opinion is without support in the record.[4] The ALJ concluded that Dr. Rodriguez's opinion was inconsistent with that of Dr. DeJesus, another of Plaintiff's treating physicians, Dr. John P. Schosheim, the medical expert who testified at Plaintiff's administrative hearing, and Angel Collazo, Plaintiff's

---

[3] While the Court concludes that the ALJ failed to adhere to the treating physician rule by discounting Dr. Rodriguez's opinion that "[Plaintiff] cannot climb, bend, or walk for any prolonged period, without experiencing severe back pain," (R. 27), the Court acknowledges that the ALJ was not required to credit Dr. Rodriguez's opinion that Plaintiff "is unable to work for at least twelve months." *See Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) ("[A] treating physician's statement that the claimant is disabled cannot itself be determinative." (quoting *Snell v. Apfel*, 177 F.3d 123, 133 (2d Cir. 1999))).

[4] The Court declines to conclude that Dr. Rodriguez does not qualify as a treating source because the record lacks clarity as to the length of her treating relationship with Plaintiff. Although the period during which Plaintiff was treated by Dr. Rodriguez is unclear because of the absence of her treating notes, the record strongly suggests that Dr. Rodriguez was Plaintiff's primary physician. Plaintiff expressly testified during the February 12, 2016 hearing that Dr. Rodriguez is her "primary doctor." (R. 118.) The medical forms completed by Dr. Rodriguez support Plaintiff's statement, as they noted, *inter alia*, that Plaintiff "attends scheduled appointments." (R. 991.) Plaintiff's patient prescription record also lists Dr. Rodriguez as having prescribed medication on several dates between November of 2014 and February of 2015. (R. 507.) In addition, while the length of a treating relationship is a relevant consideration in determining the appropriate weight a medical opinion should receive, the ALJ did not consider, much less rely on, the length of Plaintiff's treating relationship with Dr. Rodriguez (or lack thereof) to justify the weight given to her opinion, and the Court may not supply that justification in a post hoc fashion. *See Barbera v. Barnhart*, 151 F. App'x 31, 33 (2d Cir. 2005) ("A reviewing court may not supply reasons to justify an agency determination."); *Snell*, 177 F.3d at 134 ("A reviewing court 'may not accept appellate counsel's *post hoc* rationalizations for agency action.'" (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962))). Moreover, the ALJ assumed that Dr. Rodriguez qualifies as a treating source, (R. 27 (describing Dr. Rodriguez as "[Plaintiff's] treating doctor"), and the Commissioner does not argue that Dr. Rodriguez's opinion is not entitled to controlling weight because the period of treatment is unclear, (*see* Comm'r Mem.; Comm'r Reply). On remand, the ALJ should determine whether additional records reflecting the full extent of Plaintiff's treating relationship with Dr. Rodriguez can be obtained.

treating social worker. However, the ALJ does not specify how Dr. Rodriguez's opinion is inconsistent with these other assessments. In fact, these other opinions focus exclusively on Plaintiff's mental impairments and provide no insight into Plaintiff's physical limitations. For example, the ALJ stated that Dr. DeJesus diagnosed Plaintiff "with depression but that psychiatric care has not been recommended yet," and when visiting Dr. DeJesus, Plaintiff "presented oriented in all spheres, intact thought process, normal mood and affect, good attention and concentration and good memory." (R. 25.) These observations do not contradict Dr. Rodriguez's opinion as to Plaintiff's physical impairments; they simply have nothing to do with the limitations she assessed. In addition, according to the ALJ, Dr. DeJesus "opined that the claimant has no limitations in work related activities." (R. 25.) This is a misrepresentation of the record: Dr. DeJesus opined that Plaintiff has no "work-related limitation in function due to [her] *mental condition*."[5] (R. 729 (emphasis added).)

In addition, Dr. Schosheim's opinion at Plaintiff's hearing in 2016, also focused on Plaintiff's psychiatric condition. (R. 28 ("[Dr. Schoesheim, an impartial medical expert, testified that the record reveals little evidence of psychiatric care.").) Finally, Mr. Collazo's opinion as Plaintiff's social worker focused on her behavioral impairments, especially after the loss of her

---

[5] In addition, Dr. DeJesus rendered a medical opinion in September of 2013, and the ALJ rendered a decision in September of 2016. Thus, Dr. DeJesus' medical opinion is based only on some of Plaintiff's records, and is missing approximately three years' of Plaintiff's medical records. Dr. DeJesus's opinion is likely stale and of little probative value for determining the reliability of Dr. Rodriguez's opinion. *See Camille v. Colvin*, 104 F. Supp. 3d 329, 343–44 (W.D.N.Y. 2015) ("It is true that medical source opinions that are 'conclusory, stale, and based on an incomplete medical record' may not be substantial evidence to support an ALJ finding."), *aff'd*, 652 F. App'x 25 (2d Cir. 2016); *see also Acevedo v. Astrue*, No. 11-CV-8853, 2012 WL 4377323, at *16 (S.D.N.Y. Sept. 4, 2012) ("The timeliness of evidence is . . . a factor that courts have cited in finding a lack of substantial evidence in the record to affirm a decision on benefits by the Commissioner.").

son. (R. 843.) None of this evidence undermines Dr. Rodriguez's medical opinion concerning Plaintiff's physical impairments.

Moreover, Dr. Rodriguez's medical opinion is consistent with evidence in the record and should have been assigned controlling weight absent "good reasons" for doing so. For example, Dr. Yoshihara, Plaintiff's treating orthopedist, opined that, although Plaintiff did not require orthopedic spinal surgery, she should continue physical therapy and pain management. (R. 24.)

The ALJ's first reason for discarding Dr. Rodriguez's medical opinion, based on a flawed comparison of two different types of medical evidence, does not justify departure from the treating physician rule.

### ii. Dr. Rodriguez's opinion is not inconsistent with Plaintiff's daily activities

The ALJ's second reason for declining to credit Dr. Rodriguez's assessments, purported inconsistencies with Plaintiff's daily activities, fares no better. The ALJ contends that Dr. Rodriguez's opinion is not consistent with Plaintiff's "activities of daily living including being able to shop, do boot camp, cook, clean, go out with friends, [and] drive to North Carolina." (R. 27.) As an initial matter, the Court has found no evidence in the record that Plaintiff "d[id] boot camp," and the ALJ provides no citation in support of this statement. (R. 27.) The closest thing to the ALJ's reference is a treatment note stating that Plaintiff "recently ordered a pilates video." (*See* R. 642, 760.) However, in clear contrast to "*do[ing]* boot camp," which information provides insight into a claimant's physical abilities, the mere ordering of a pilates video says nothing about what a claimant is capable of doing, and does not constitute substantial evidence sufficient to contradict Dr. Rodriguez's opinion as to Plaintiff's limitations. *See Balsamo v. Chater*, 142 F.3d 75, 81–82 (2d Cir. 1998) ("[W]hen a disabled person gamely chooses to endure pain in order to pursue important goals . . . it would be a shame to hold this endurance against

17

him." (citations and internal quotation marks omitted)). Moreover, Plaintiff's daily activities including cooking, cleaning, and going out with friends also do not constitute substantial evidence sufficient to contradict Dr. Rodriguez's opinion. *See Cabibi v. Colvin*, 50 F. Supp. 3d 213, 238 (E.D.N.Y. 2014) ("Indeed, it is well-settled that the performance of basic daily activities does not necessarily contradict allegations of disability, as people should not be penalized for enduring the pain of their disability in order to care for themselves." (first quoting *Valet v. Astrue*, No. 10-CV-3282, 2012 WL 194970, at *19 (E.D.N.Y. Jan. 23, 2012); and then collecting cases)).

Accordingly, because the ALJ failed to properly apply the treating physician rule, remand is warranted.

### III. Conclusion

For the foregoing reasons, the Court denies Defendants' motion for judgment on the pleadings, and remands the case for further proceedings consistent with this Memorandum and Order.

SO ORDERED:

    s/ MKB
MARGO K. BRODIE
United States District Judge

Dated: September 28, 2018
       Brooklyn, New York